# In the United States Court of Federal Claims

No. 21-2035C

(E-filed: March 1, 2022)[1]

|  |  |
|---|---|
| TRIDENT TECHNOLOGIES, LLC, ) ) Plaintiff, ) ) v. ) ) THE UNITED STATES, ) ) Defendant, ) and ) ) DTECHLOGIC, LLC, ) ) Intervenor-defendant. ) ) | Post-Award Bid Protest; Motion for Judgment on the Administrative Record; RCFC 52.1; Organizational Conflicts of Interest. |

Joseph D. West, Washington, DC, for plaintiff. Lindsay M. Paulin, Chelsea B. Knudson, Nathaniel J. Tisa, and Michael M. Ulmer, of counsel.

Igor Helman, Trial Attorney, with whom were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Maj. Seth Ritzman and James D. Stephens, United States Army Legal Services Agency, and Brian Chapuran, Missile Defense Agency, of counsel.

Roderic G. Steakley, Huntsville, AL, for intervenor-defendant DTechLogic, LLC. Benjamin R. Little, of counsel.

---

[1] This opinion was issued under seal on February 11, 2022. See ECF No. 68. The parties were invited to identify source selection, propriety, or confidential material subject to deletion on the basis that the material is protective/privileged. The parties' proposed redactions were acceptable to the court. See ECF No. 70 (status report). All redactions are indicated by brackets ([ ]).

OPINION

CAMPBELL-SMITH, Judge.

Plaintiff filed this bid protest challenging the Department of Defense (DOD), Missile Defense Agency's (MDA) award in its procurement of a support contract for its Advanced Research Center (ARC).  See ECF No. 1 (complaint).  Plaintiff filed a motion for judgment on the administrative record (AR) in this case, ECF No. 42; and defendant and intervenor-defendant each filed cross-motions for judgment on the AR, ECF No. 49; ECF No. 50.

In ruling on the motions, the court has considered:  (1) plaintiff's complaint, ECF No. 1; (2) the AR, ECF No. 32, ECF No. 35, ECF No. 41; ECF No. 53;[2] (3) plaintiff's motion for judgment on the AR, ECF No. 42, and corrected memorandum in support of its motion, ECF No. 58; (4) intervenor-defendant's cross-motion for judgment on the AR and response to plaintiff's motion, ECF No. 49; (5) defendant's cross-motion for judgment on the AR, and response to plaintiff's motion, ECF No. 50; (6) plaintiff's reply in support of its motion and response to the cross-motions, ECF No. 60; (7) intervenor-defendant's reply in support of its cross-motion, ECF No. 62; (8) defendant's reply in support of its cross-motion, ECF No. 63; and (9) plaintiff's supplemental brief in support of its motion, ECF No. 66.

The motions are fully briefed, and ripe for decision.  The parties did not request oral argument, and the court deems such argument unnecessary.  The court has considered all of the parties' arguments and addresses the issues that are pertinent to the court's ruling in this opinion.  For the following reasons, plaintiff's motion for judgment on the AR is **DENIED**, and defendant's and intervenor-defendant's cross-motions for judgment on the AR are **GRANTED**.

---

[2]     After filing the administrative record (AR), defendant filed three motions to correct and complete the AR.  See ECF No. 33 (motion for leave to refile a corrupt document); ECF No. 38 (motion for leave to file document inadvertently omitted from the original AR); ECF No. 51 (motion for leave to file document inadvertently omitted from the original AR).  The court granted each motion and directed defendant to complete the AR by filing the documents using the case management/electronic case filing system docketing event "supplement to the AR," see ECF No. 34; ECF No. 40; ECF No. 52, which defendant did, see ECF No. 32; ECF No. 41; ECF No. 53.

I.      Background[3]

    A.      The Missile Defense Agency

The MDA is a research and development agency whose primary mission is to "develop and field" a Missile Defense System (MDS) to protect the United States from hostile missile attack. ECF No. 50 at 11. As part of ensuring it is prepared to fulfill its mission, the agency conducts testing of its MDS using "highly advanced modeling and simulation activities," which require the agency to "provide[], maintain[], and develop[] common test resources and infrastructure." Id. at 13. To conduct those tests, the agency relies on the ARC, whose mission "'is to perform network/infrastructure design, house and maintain the []MDS guided missiles and space tactical hardware and software, to maintain cybersecurity compliance, and to perform lab asset management to realistically emulate/simulate the complex weapon systems' of the MDS." Id. (quoting Advanced Concepts Enters., Inc. v. United States, 142 Fed. Cl. 187, 191 (2019)); see also ECF No. 32-27 at 475 (March 5, 2021, revision 02, ARC Performance Work Statement (PWS)).

The agency also relies on contractors to "perform network and infrastructure design, as well as to develop and maintain the test networks and test assets located in the ARC in a cybersecurity compliant environment." ECF No. 50 at 14 (citing ECF No. 32-27 at 475; ECF No. 32-2 at 241). The agency performs the testing, while the contractor supports the test environment by maintaining the ARC's assets. See id.

    B.      The Solicitation

The procurement at issue here, first begun in 2017, sought support for the "management of the facility and [equipment] that comprises the ARC." ECF No. 32-2 at 13 (ARC Statement of Work, 2017). Prior to issuing the solicitation, the agency issued multiple requests for industry input on its draft statement of work, technical library content, small business interest, and potential organizational conflict of interest (OCI) concerns, and conducted industry day programs seeking input on the contents of the proposed solicitation. See ECF No. 32-2 at 5-11 (May 8, 2017 ARC Request for Information (RFI)), 197-204 (June 30, 2017 ARC market research report), 205-73 (June 30, 2017 first industry day program), 274-95 (October 24, 2017 RFI), 469-74 (November 8, 2017 RFI regarding OCI requirements), 476-80 (December 8, 2017 ARC market research report), 787-832 (April 11, 2018 second industry day program). The agency also "sought early input from potential offerors" about possible OCIs. ECF No. 58 at 11; see also, e.g., ECF No. 32-2 at 469-74 (November. 8, 2017 RFI regarding OCI requirements).

---

[3]     This case involves considerable detail. For purposes of deciding these motions the court will relate only those details that are necessary to the instant analysis.

3

On September 10, 2018, the agency issued Solicitation No. HQ0147-18-R-0009 (solicitation) seeking a single contractor to provide infrastructure, operations and maintenance (O&M), and cybersecurity engineering to support the agency's testing operations.  See ECF No. 32-3 at 65-594 (September 10, 2018 solicitation).  Award was to be made on a best value basis "based upon an integrated assessment of all aspects of the evaluation factors and subfactors to include Cost and Price."  Id. at 580.

The solicitation provided that proposals would be evaluated on six factors.  Id. at 582.  The first three—Information Management Control Plan, Transition Plan, and Past Performance—were to be rated either acceptable or unacceptable, with only those rated acceptable in all three moving forward in review.  See id.  The agency was then to make tradeoff decisions with respect to factors four, five, and six, which were the ARC Technical Rating, Contract and Program Management, and Cost and Price, respectively.  See id.  Of the final three factors, factors four and five combined were "significantly more important" than factor six, and factor four was more important than factor five.  Id.  Factor six, cost and price, was to be evaluated for reasonableness and realism "as part of the integrated assessment of best value."  Id.

The solicitation also included several provisions regarding OCIs.  Specifically, it required the offerors to disclose, prior to award, "all facts relevant to the existence or potential existence" of OCIs and to "complete an OCI Analysis/Disclosure Form for each MDA, Ballistic Missile Defense (BMD), and BMD-related contract or subcontract."  Id. at 106.  It also required offerors to "identify all actual or potential conflicts of interest that might occur," "identify all of the team's MDA-funded contracts or subcontracts; MDS-related contracts or subcontracts; and, any significant, non-MDS related business relationships with firms doing business with or in support of MDA."  Id. at 450.  Should any of the information provided change, offerors were also required to update their assessments with the agency.  See id.

The solicitation further incorporated the agency's OCI Policy Memorandum.  See id. at 208-09 (May 30, 2012 OCI Policy Memorandum No. 51).  The policy provides that "contractors which provide advisory and assistance services to the Agency, particularly in the engineering, acquisition support, and quality functional areas, cannot develop or support the development of the Agency's research and development (R&D) efforts."  Id. at 208.  Offerors were required to review this policy and "ensure their proposal and teaming arrangement [were] consistent" with the policy.  Id. at 449.

      C.      The Evaluation

Four contractors submitted proposals in October 2018, and the agency established a competitive range in March 2019 consisting of three of the four proposals.  See ECF No. 32-9 at 89-98 (March 4, 2019 competitive range decision document).  The three

offerors included in the competitive range were plaintiff, intervenor-defendant, and a third contractor, Kord Technologies, Inc. (Kord). See id.

After discussions and receipt of final proposal revisions from the offerors, in May 2019, the source selection team presented a source selection decision brief to the source selection authority (SSA), and the SSA made a source selection decision. See ECF No. 32-13 at 195-215 (May 03, 2019 source selection decision information briefing), 216-20 (May 6, 2019 SSA memorandum for record). The agency then awarded the contract to intervenor-defendant based on that decision. See ECF No. 32-14 at 10-75.

In July 2019, plaintiff filed a protest at the Government Accountability Office (GAO) alleging, among other claims, that the agency failed to recognize OCIs. See id. at 552-86. Kord also protested the award and also alleged several OCIs. See id. at 263-90; 450-69. In response, the agency initiated an OCI investigation, and, in August 2019, notified the GAO that it would take corrective action by continuing the investigation and "revisit[ing] the acquisition, evaluations, and award decision to determine what actions, if any, were warranted." Id. at 707; see also id. at 709-11 (memorandum from contracting officer detailing the basis for the corrective action). In response, the GAO dismissed plaintiff's protest as academic. See ECF No. 32-14 at 717-18 (August 15, 2019 GAO decision).

The agency then requested final proposal revisions from each offeror, to be submitted in November 2019, which the agency intended to re-evaluate. See ECF No. 32-15 at 46-51. On January 10, 2020, the agency communicated the results of its evaluation to the SSA, and the SSA established a new competitive range including only plaintiff and intervenor-defendant. See ECF No. 32-24 at 109-58 (January 10, 2020 competitive range briefing); id. at 160-66 (January 15, 2020 competitive range decision document). The agency reopened discussions with the two remaining offerors on January 16, 2020, and closed them on January 24, 2020, when it requested final proposal revisions. See id. at 270, 284, 301, 303. The agency concluded its evaluation of the January 2020 proposals in October 2020. See ECF No. 32-27 at 207-324 (October 19, 2020 proposal analysis report).

On December 15, 2020, intervenor-defendant notified the agency about a change in key personnel. See id. at 353. This prompted the agency to reopen discussions with both plaintiff and intervenor-defendant on January 13, 2021. See id. at 352-53, 364-66. The agency then issued amendment 6 to the solicitation on March 9, 2021, at the conclusion of those discussions. See id. at 375-473 (amendment 6). Once again, the agency requested final proposal revisions from the two remaining offerors, which they submitted on April 2, 2021. See id. at 549-52; ECF No. 32-28 at 1-80 (DTechLogic April 2, 2021 final proposal revision); ECF No. 35-1, 35-2 (Trident April 2, 2021 final proposal revision).

Upon receiving the proposals, the agency evaluation team discovered that intervenor-defendant had omitted a previously included contract clause regarding [ ]. See ECF No. 32-30 at 9-13 (May 17, 2021 source selection update); id. at 35-39 (evaluation notice). The [ ] had previously been the subject of discussion with intervenor-defendant because it had not been supported by intervenor-defendant's [ ]. See id. at 9. To resolve the issue, intervenor-defendant had agreed to include the contract clause obligating [ ]. See id. Thus, when the agency discovered that the clause had been removed, it reopened discussions on May 25, 2021, with intervenor-defendant to ensure meaningful discussions. Id. at 35-36. The agency then again requested final proposal revisions, which intervenor-defendant submitted on May 27, 2021, and plaintiff affirmed its April 2, 2021 final proposal revision with no changes. See ECF No. 32-30 at 42, 44, 46, 327.

Intervenor-defendant notified the agency of a change in key personnel once more, which once again prompted the agency to reopen discussions with the offerors. See ECF No. 50 at 25 n.5. At the conclusion of discussions, on July 15, 2021, the agency again requested final proposal revisions. ECF No. 32-30 at 335. This same issue arose again, and was resolved in the same manner in August 2021. See id. at 458.

The SSA evaluated each offeror's final proposal and issued a final cost evaluation report on August 16, 2021, and a final proposal analysis report on August 29, 2021. See ECF No. 32-30 at 582-604 (August 16, 2021 cost/price evaluation report), 605-723 (August 19, 2021 proposal analysis report). On August 30, 2021, the SSA reaffirmed the award to intervenor-defendant. See id. 724-26 (August 30, 2021, SSA memorandum for record).

      D.      The OCI Evaluations

After the initial proposals were submitted in October 2018, the agency reviewed the included OCI assessments, and, in January 2019, investigated intervenor-defendant's OCIs and drafted a memorandum recording the investigation. See ECF No. 32-14 at 719-21 (May 13, 2019 contracting officer memorandum for record). The agency was unable to determine whether an OCI existed as a result of intervenor-defendant's Integrated Air and Missile Defense Battle Command System (IBCS) work, so it contacted the Army for additional information. See id. at 720. The Army responded in April 2019 that "there are potential OCI concerns" because of intervenor-defendant's work and the "broad scope" of the PWS. Id. The contracting officer then requested the scope of work (SOW) from the Army and forwarded it to the ARC program manager for review. See id. Upon review of the Army SOW, the ARC program manager agreed with the contracting officer that, "[w]hile there are some similar efforts . . . there is nothing that would give an unfair advantage to the ARC work based upon a contractor performing on the IBCS SOW." Id. at 721.

6

The agency next reviewed potential OCIs when plaintiff protested the agency's first award to intervenor-defendant in July 2019. See ECF No. 50 at 17 (citing ECF No. 32-14 at 724-28). The contracting officer requested additional information from intervenor-defendant about the OCI allegations and key personnel issues raised in the protest. See ECF No. 32-14 at 724-28. Intervenor-defendant provided information about one of its subcontractors and one of its joint venture members and confirmed the key personnel it had proposed for one position, as well as a change in its proposed key personnel for another position. Id. at 729-38.

The agency found a potential impaired objectivity OCI for intervenor-defendant's subcontractor and notified intervenor-defendant of the issue. See id. at 741-42. In response, intervenor-defendant asserted that it proposed a limited role for the subcontractor, argued that there was no appearance of an OCI, and provided a mitigation plan. See id. at 750-52. After further discussion, intervenor-defendant removed the subcontractor from its proposed team. See id. at 758.

Likewise, the contracting officer reviewed potential conflicts of interest with intervenor-defendant's joint venture member and a second subcontractor. See id. at 763-65, 906-07. In both cases, the contracting officer verified the information provided by intervenor-defendant and prepared a draft OCI determination. See id.

In addition to addressing these specific issues, as part of the corrective action that the agency reported to the GAO in August 2019, the agency undertook the OCI investigation and convened OCI review panels—an internal agency OCI review and investigation process. Id. at 1001-03 (June 23, 2021 contracting officer memorandum for record documenting the OCI investigation process); 856-90 (November 10, 2020 OCI panel review); 949-69 (June 22, 2021 OCI panel review).

E.     Procedural History

After an agency debrief, on September 15, 2021, plaintiff protested the award to intervenor-defendant at the GAO. See ECF No. 1 at 30. While that protest was pending, the incumbent contractor on the ARC support contract, COLSA Corporation, filed a protest of the agency's award decision in this court. See id.; see also COLSA Corp. v. United States, Case No. 21-1912 (filed September 27, 2021). In response, the GAO dismissed plaintiff's protest on October 8, 2021. See ECF No. 1 at 30. Plaintiff then filed the instant protest on October 18, 2021. See id.

The parties have now filed cross-motions for judgment on the AR, which are fully briefed and ripe for decision.

II.     Legal Standards

In its complaint, plaintiff invokes this court's bid protest jurisdiction. See ECF No. 1 at 2. This court's bid protest jurisdiction is based on the Tucker Act, which gives the court authority:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). The Tucker Act also states that the court may grant "any relief the court considers proper . . . including injunctive relief." 28 U.S.C. § 1491(b)(2).

To establish jurisdiction, a plaintiff must therefore demonstrate that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has held that the "interested party" requirement "imposes more stringent standing requirements than Article III." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Though the term "interested party" is not defined by the statute, courts have construed it to require that a protestor "establish that it '(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'" See id. (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006)) (alteration in original).

Once jurisdiction is established, the court's analysis of a "bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines, pursuant to the Administrative Procedure Act standard of review, 5 U.S.C. § 706, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)). If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial. See Bannum, 404 F.3d at 1351.

To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'" Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). "In other words, the protestor's chance of securing the award must not have been insubstantial." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citations omitted). The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors. See Data Gen. Corp. v.

Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract."); Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014). But plaintiff must, at minimum, show that "had the alleged errors been cured, . . . 'its chances of securing the contract [would have] increased.'" Precision Asset Mgmt. Corp. v. United States, 125 Fed. Cl. 228, 233 (2016) (quoting Info Tech., 316 F.3d at 1319).

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential." Advanced Data Concepts, 216 F.3d at 1058. As the Supreme Court of the United States has explained, the scope of review under the "arbitrary and capricious" standard is narrow. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974). "A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,'" and "'[t]he court is not empowered to substitute its judgment for that of the agency.'" Id. (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)); see also Weeks Marine, 575 F.3d at 1368-69 (stating that under a highly deferential rational basis review, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

III.     Analysis

In its motion, plaintiff argues that the award should be set aside because: (1) the agency failed to reasonably investigate or mitigate intervenor-defendant's OCIs, see ECF No. 58 at 29-45; (2) the agency engaged in unequal discussions with intervenor-defendant, see id. at 45-50; (3) the agency applied the evaluation criteria inconsistently, see id. at 50-59; and (4) the agency's best value determination was unreasonable, see id. at 59-60. The court will address each of plaintiff's contentions in turn.

A.     The Agency's Evaluation of Potential OCIs Was Reasonable

Plaintiff contends that the agency's evaluation and mitigation of intervenor-defendant's OCIs had "no reasonable basis." ECF No. 58 at 29. Plaintiff cites six specific examples of OCIs it contends the agency failed to reasonably evaluate—three impaired objectivity OCIs and three unequal access to information OCIs. See id. at 31-40.

i.     Impaired Objectivity OCIs

First, plaintiff argues that Davidson and nLogic, members of the DTechLogic joint venture, both had impaired objectivity OCIs related to the Ground-Based Midcourse Defense Weapon System (GMD) contract, on which both were subcontractors. See id. at 31-33 (discussion of Davidson's OCI), 33 (discussion of nLogic's OCI). According to plaintiff, pursuant to the GMD contract Davidson [ ]. Id. at 31 (quoting ECF No. 32-2 at

120). Plaintiff contends that this presents a conflict that the agency failed to adequately mitigate because the awardee is responsible for "'all ARC test assets' regardless of what ARC segment they fall under" and "will be able to impact data related to [ ]." Id. at 32 (quoting ECF No. 32-27 at 483)[4] (emphasis in original). Likewise, plaintiff argues that nLogic would be in a position to "evaluate and/or provide input on nLogic's work under the ARC Contract," because it "provides 'systems engineering and integration, modeling & simulation, [and] system test' services," under the GMD contract, and would be "integrating test assets into the ARC infrastructure, and evaluating and testing related software" under the ARC contract. Id. at 33. Therefore, according to plaintiff, it presents a conflict the agency "inexplicably concluded" was not an OCI. Id. (citing ECF No. 32-2 at 414).

Second, plaintiff argues that nLogic had an impaired objectivity OCI related to the Radar Test Contract (RTC). See id. at 33-34. According to plaintiff, nLogic will "review or provide input on [ ] that nLogic will work on under the RTC," putting it in a position to evaluate its own work and resolve conflicts between the various test assets in its own favor. Id. at 34. Plaintiff also argues that the mitigation plan—nLogic agreed to decline task orders under the RTC—is "unreasonable." Id.

Plaintiff further contends that these OCIs are not mitigable with government oversight, which the agency unreasonably concluded "obviated any OCI." Id. Citing a GAO case, plaintiff argues that oversight cannot mitigate an impaired objectivity OCI here because the contractor's "testing and support roles are too significant to erase or mitigate." Id. at 36 (citing ASM Rsch., B-412187, 2016 CPD ¶ 38 at *6). And, again citing GAO precedent, plaintiff argues that the government cannot easily vet a contractor's inputs on the test assets and sensors, and "the record is silent as to how government oversight would result in sufficient vetting." Id. at 36 (citing Nortel, B-299522.5, 2009 CPD ¶ 10 at *5) (emphasis in original).

Defendant responds that "none of the OCI contentions . . . [are] borne out by the record." ECF No. 50 at 31. Defendant notes that the contracting officer explained in the OCI determination that although the contractor provides infrastructure and test asset management support, "the testing itself is conducted and directed by the [g]overnment." Id. This means, defendant argues, that there was no impaired objectivity OCI because the contractor "was not designing or running the tests of its own units in the ARC," id., or "put in a position to evaluate or provide input on the actual elements of the MDS developed under the GMD Contract," id. at 33 (emphasis in original). Likewise, the agency "determined that nLogic does not perform any work" on the RTC. Id. at 34.

Defendant contends that plaintiff failed to "explain how impacting network design would allow the ARC contractor to manipulate the results of tests subsequently run on

---

[4]   Plaintiff cites ECF No. 32-27 at 482. The quoted language is found at ECF No. 32-27 at 483. The court assumes this was a typographical error.

those networks or to evade [g]overnment review of that design and [g]overnment supervision of the actual tests." Id. at 32. Further, according to defendant, the contracting officer determined that government oversight and direction would mitigate any impaired objectivity OCI because, with the oversight, "'networks cannot be manipulated to inflate or mitigate performance of' the units being tested, [ ]." Id. at 32 (quoting ECF No. 32-15 at 1002); see also id. at 36-37. Defendant thus concludes that plaintiff's arguments are mere speculation and do not rise to the level of the "'hard facts'" necessary to prove an OCI. See id. (quoting Commc'n Constr. Servs., Inc. v. United States, 116 Fed. Cl. 233, 265 (2014)).

"The responsibility for determining whether [an OCI] exists and what steps should be taken in response thereto rests squarely with the contracting officer." ARINC Eng'g Srvs., LLC v. United States, 77 Fed. Cl. 196, 202 (2007). Under the highly deferential rational basis review called for in this case, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" Weeks Marine, 575 F.3d at 1368-69 (quoting Advanced Data, 216 F.3d at 1058)). In the court's view, the agency's OCI investigation and determination with respect to impaired objectivity OCIs reflected both rational reasoning and consideration of the relevant factors.

The contracting officer in this case addressed each of the OCIs plaintiff raises in its motion as part of its investigation into intervenor-defendant's potential OCIs. See ECF No. 32-14 at 719-1047 (documenting the OCI investigation and determinations). Plaintiff itself references the agency's investigation and determinations in its argument. See ECF No. 58 at 31-37 (citing to various pages of the agency's documentation throughout). Plaintiff's allegations appear to the court to largely rehash the facts underlying the OCIs that the agency has already reviewed and established a plan to mitigate. Compare, e.g., id. at 31-33 (arguing that Davidson presents an OCI), with ECF No. 32-14 at 770-73 (August 2019 OCI determination reviewing Davidson's potential OCIs). Without more, plaintiff's allegation amount to a disagreement with the contracting officer's conclusions rather than a presentation of the "hard facts" necessary to sustain a finding of an OCI. See PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010) ("To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough.") (citing C.A.C.I., Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

Likewise, plaintiff fails to persuade the court that the agency's mitigation plan is unreasonable. The court agrees with defendant that, "[a]lthough [plaintiff] disagrees with the agency's reasons and determination regarding how to mitigate OCIs, 'that is no basis for the [c]ourt to second-guess the agency's exercise of its discretion.'" ECF No. 50 at 47 (quoting Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 364 (2009)). Plaintiff has pointed to no facts demonstrating that the agency's mitigation plan

11

is unreasonable. The court is not empowered to substitute its judgment for that of the agency and declines to do so here. Bowman, 419 U.S. at 285; PAI, 614 F.3d at 1352.

        ii.        Unequal Access to Information OCIs

Plaintiff argues that intervenor-defendant had unequal access to "competitively useful, non-public information through Davidson's and nLogic's work on the GMD [c]ontract." ECF No. 58 at 37. According to plaintiff, the agency "acknowledged that both Davidson and nLogic had unequal access to non-public GMD-related information, but that such information was not competitively useful because '[intervenor-defendant's] proposal was not assessed a strength in Factor 4, Subfactor 2, Test [S]upport in the area of integration and test.'" Id. (quoting ECF No. 32-14 at 962, 964) (emphasis in original). Plaintiff contends that the agency's response was "contrary to law and fact" because information can be competitively useful without it specifically benefitting a proposal and the lack of a strength does not signify a lack of benefit. Id. In fact, plaintiff contends, the "distinguishing factor upon which [the agency] based its best value tradeoff was premised on [intervenor-defendant's] unmitigated OCIs." Id. at 38.

Plaintiff likewise argues that intervenor-defendant had unequal access to information as a result of two other contracts on which its joint venture members and subcontractors worked. See ECF No. 58 at 38-40. According to plaintiff, this access gave intervenor-defendant a competitive advantage, and the agency's conclusions that no OCI existed were flawed. See id. Plaintiff argues that the agency failed to recognize that intervenor-defendant gained a competitive advantage and failed to pursue the additional information it needed to make a full determination as to whether an OCI existed. See id. at 39-40. This, plaintiff argues, makes the agency's determinations unreasonable. See id.

Defendant responds that plaintiff's allegations are speculative and conclusory and that the agency reasonably addressed the OCIs. See ECF No. 50 at 40-45. According to defendant, plaintiff failed to provide the "hard facts" necessary to prove its claims and failed to explain how its allegations created unequal access to information OCIs. See id. at 40. Defendant contends that plaintiff "is unable to identify with specificity anything" that intervenor-defendant may have learned from its other contracts that gave it a competitive advantage. Id. at 41; see also id. at 45 (arguing plaintiff failed to identify "what specific proprietary or source-selection sensitive information" intervenor-defendant gleaned). Instead, defendant argues, plaintiff's allegations amount to "thinly veiled invitation[s] to find an unequal access OCI merely through incumbency." Id. at 42; see also id. at 43 (arguing that plaintiff "offers no more than a bare assertion" of an OCI).

The court agrees with defendant that plaintiff's allegations do not rise to the level of the "hard facts" necessary to prove an OCI. Turner Const. Co., Inc. v. United States, 645 F.3d 1377, 1387 (Fed. Cir. 2011) (quoting PAI, 614 F.3d at 1352). To find an OCI,

plaintiff must put forward "hard facts" that "indicate the existence or potential existence of impropriety." Id. The court will not find an OCI based on "inferences," or "suspicion and innuendo." Id. (citations and quotation marks omitted).

In the court's view, as with plaintiff's impaired objectivity OCI allegations, plaintiff's argument here amounts to a disagreement with the contracting officer's conclusions about intervenor-defendant's potential OCIs. Although plaintiff points to record evidence about potential OCIs, the record also reflects that the agency addressed each of plaintiff's allegations as it came to light. See, e.g., ECF No. 32-14 at 719-1047 (documenting the agency's OCI investigation). Plaintiff has provided no "hard facts," see PAI, 614 F.3d at 1352, or explanation to demonstrate that the agency's resolution was unreasonable; rather plaintiff reasserts the same facts that the agency acknowledged in its OCI investigation and determinations, see ECF No. 58 at 37-40; ECF No. 32-14 at 719-1047. Without more, the court finds that the agency performed a reasonable evaluation of the potential OCIs and developed reasonable mitigation plans. Under these circumstances, the court cannot substitute its judgment for that of the agency, and plaintiff's claims on this point must fail. See Bowman, 419 U.S. at 285; PAI, 614 F.3d at 1352.

### iii. Failure to Disclose OCIs

Finally, plaintiff argues that intervenor-defendant's failure to disclose its OCIs on multiple occasions disqualifies it from award. See ECF No. 58 at 40-45. Plaintiff contends that intervenor-defendant failed to disclose "at least eight OCIs throughout the initial procurement and corrective action." Id. at 40. Plaintiff argues that this failure constituted a material misrepresentation, even if intervenor-defendant did not intend to deceive the agency, and should have resulted in the agency disqualifying intervenor-defendant. See id. at 42 (citing NetCentrics Corp. v. United States, 145 Fed. Cl. 158, 170 (2019)); see also id. at 45 ("[T]he Agency's repeated failures to consider reasonably the seemingly endless parade of OCIs presented and concealed by [intervenor-defendant] and its team members require that the award be set aside.")

Defendant responds that, although the agency could have disqualified intervenor-defendant, it did not act arbitrarily or capriciously when it exercised its discretion and declined to do so. See ECF No. 50 at 45-47.

Once again, in the court's view, plaintiff's assertions amount to a disagreement with the agency's conclusions. "[T]he [Federal Acquisition Regulations (FAR)] provides a contracting officer with considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts and to develop a mitigation plan in the event that a significant potential conflict exists." PAI, 614 F.3d at 1352-53. The record demonstrates that the agency reviewed the OCIs that arose during the procurement process and developed a mitigation plan for them. See, e.g., ECF No. 32-14 at 763-73

13

(August 2019 OCI determinations). The agency's decision to permit intervenor-defendant to continue in the procurement was within its discretion. See NetCentrics, 145 Fed. Cl. at 169-70 (concluding that it is within the agency's discretion to reject a proposal containing inadvertent misrepresentations). Although plaintiff may disagree with the agency's OCI determinations and its decision to permit intervenor-defendant to remain in the competition, plaintiff has pointed to no facts demonstrating that the agency's actions were irrational or unreasonable. Without more, the court will not substitute its judgment for the agency's considered determination under such circumstances. See Bowman, 419 U.S. at 285.

### B. The Agency Did Not Engage in Unequal Discussions

In its motion, plaintiff argues that the agency engaged in unequal discussions with intervenor-defendant when it "coach[ed] [intervenor-defendant] through evaluation notices . . . that suggested specific revisions" to intervenor-defendant's final proposal revisions (FPR), "while leaving [plaintiff] to rest" on an earlier FPR. ECF No. 58 at 45. According to plaintiff, during the May 2021 discussions, the agency issued an evaluation notice to intervenor-defendant "warning that [its] April FPR alluded to a contract clause [ ]." Id. at 47. According to plaintiff, this warning was intended to coach intervenor-defendant into a price reduction, "allow[ing] MDA to remove the upward cost realism adjustment imposed on [intervenor-defendant's] proposed price" and "reducing the cost premium for [intervenor-defendant's] proposal [ ]." Id. The agency did not provide plaintiff with a similar opportunity, and "[w]ithout any guidance whatsoever from MDA, [plaintiff] simply resubmitted its April FPR." Id. at 48. This, plaintiff argues, constituted conduct favoring intervenor-defendant over plaintiff—a violation of the law. See id. at 48-49. Plaintiff further contends that it was prejudiced by the agency's actions because it could have revised its proposal and "ultimately achieved higher technical ratings." Id. at 50.

Defendant responds that plaintiff's "claims of coaching and unequal discussions are not borne out by the record." ECF No. 50 at 47. According to defendant, "the MDA re-opened discussions to follow-up regarding a resolution to a problem that had initially been incorporated into [intervenor-defendant's] proposal but was subsequently omitted without explanation, re-introducing a discrepancy in [intervenor-defendant's] proposal." Id. at 48. Defendant contends that the agency appropriately re-opened discussions with intervenor-defendant to ensure that its previous discussions with intervenor-defendant were meaningful. See id. at 49 (citing ECF No. 32-30 at 9, 39). Defendant further argues that the discussion did not provide "materially disparate information," rather the evaluation identified an issue consistent with the FAR's directive that discussions "'maximize the [g]overnment's ability to obtain best value.'" Id. at 50 (quoting FAR § 15.306(d)(2)).

The court agrees with defendant that the record does not support plaintiff's interpretation of the evaluation notice. Rather than coaching, the evaluation notice to intervenor-defendant appears to be an attempt to remedy a discrepancy that had previously been resolved. See ECF No. 32-30 at 9-13 (May 17, 2021 source selection update); id. at 39 (evaluation notice). The record supports defendant's explanation of the May 2021 discussions. The agency explained that intervenor-defendant's price increased in its April 2021 FPR because a previously included contract clause was omitted. See id. at 9. The contracting officer therefore suggested re-opening discussions to address the discrepancy. See id. at 13. When the agency issued an evaluation notice to intervenor-defendant the agency notified it of the discrepancy and asked it to "explain why this rate is realistic based on the data provided" by intervenor-defendant or to "provide a clause to be incorporated into the resultant contract to enforce the rate ceiling." Id. at 39.

In the court's view, the agency's decision to reopen discussions with intervenor-defendant and its explanation for that action are documented in the record and evince every hallmark of rational reasoning and consideration of the relevant factors. Discussions are meaningful "if 'they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit.'" Banknote Corp. of America, Inc. v. United States, 56 Fed. Cl. 377, 384 (2003) (quoting WorldTravelService v. United States, 49 Fed. Cl. 431, 439 (2001)). And, agencies "should tailor . . . discussions to each offer, since the need for clarifications or revisions will vary with the proposals." WorldTravelService, 49 Fed. Cl. at 439. The court is unconvinced that the agency's decision to issue its evaluation notice to intervenor-defendant amounted to coaching as plaintiff suggests. See ECF No. 58 at 45. Rather, the agency's decision was documented and followed the guidance requiring it to tailor discussions and lead offerors with specificity to the areas of their proposals requiring correction. See Banknote Corp., 56 Fed. Cl. at 384. The court will "sustain an agency action evincing rational reasoning and consideration of relevant factors." Weeks Marine, 575 F.3d at 1368-69 (quotation marks and citation omitted). Therefore, the court declines to overturn the agency's action, and plaintiff's claim on this point must fail.

        C.      The Agency's Evaluation of Plaintiff's Proposal Was Reasonable

Plaintiff next argues that the agency "violated fundamental principles of procurement law by inconsistently applying the evaluation criteria to [plaintiff's] and [intervenor-defendant's] proposals." ECF No. 58 at 50. According to plaintiff, the agency assessed plaintiff's "identical data management approach" as acceptable under one factor and good under another without offering a "'meaningful difference' that justifies its differential treatment." Id. at 52 (emphasis in original). Plaintiff further contends that the agency failed to consider its "material amendments" to its approach to the program management subfactor. Id. at 53. This "failure even to mention, let alone to take into account, substantial developments in [plaintiff's] proposals" is evidence that the

15

agency "manufactured a sham corrective action process to justify re-awarding the ARC Contract" to intervenor-defendant. Id.; see also id. at 54-56 (detailing and comparing the agency's review of plaintiff's final proposal with its earlier review). Finally, plaintiff contends that the agency "relied on a series of unfair, irrational, and unexplained distinctions between" plaintiff's and intervenor-defendant's proposals within factors four and five. Id. at 56. Plaintiff details several instances of what it contends amounts to disparate treatment and argues that the agency's actions prejudiced it because "any additional recognition of strengths or upward changes" within factors four and five "would have substantially increased [plaintiff's] chances of award." Id. at 59; see also id. at 56-58 (detailing instances of disparate evaluation).

Defendant responds that plaintiff's argument amounts to an "attempt to re-weigh the agency's technical evaluation," in contravention of the discretion granted to the agency. ECF No. 50 at 51. According to defendant, the record demonstrates that the agency properly considered, identified, and explained the strengths in plaintiff's proposal. See id. at 52-55. Defendant also contends that plaintiff was not prejudiced by the evaluation because "[a]ll Sub-factors under the Technical Factor were of equal weight," and "[t]he net result" of the evaluation was each offeror receiving "one Good rating and one Acceptable rating." Id. at 54. Finally, defendant argues that the agency did not disparately treat the offerors, but rather treated them consistently with the evaluation criteria. See id. at 56. Defendant asserts that plaintiff's arguments "amount to no more than a mere disagreement with the MDA's ultimate findings." Id. at 57.

Although plaintiff couches its argument on this claim as inconsistent evaluation or disparate treatment, in the court's view, plaintiff's contentions amount to disagreements with the agency's evaluation. Plaintiff points to the manner in which the agency treated its data management approach under two evaluation factors as evidence of inconsistent application of the evaluation criteria. See ECF No. 58 at 51-53. The agency is, however, entitled to view aspects of plaintiff's proposal differently under different subfactors if it "articulate[s] a rational connection between the facts found and the choice made." Bowman, 419 U.S. at 286. It is apparent in the record that the agency considered all aspects of plaintiff's proposal during its evaluation and documented its reasoning for its decisions in its extensive Proposal Analysis Report. See ECF No. 32-30 at 617-62 (August 29, 2021 proposal analysis report detailing plaintiff's evaluation); id. at 644-45, 649-50 (specifically reviewing plaintiff's proposal under subfactor 4.2 and 4.4). The court cannot discern any inconsistent application of the evaluation criteria here, and the agency has clearly articulated the reasons for its evaluation decisions. See ECF No. 32-30 at 644-45, 649-50.

Likewise, the factors for which plaintiff asserts the agency exhibited disparate application of the evaluation criteria between plaintiff and intervenor-defendant are thoroughly discussed, and the agency's decisions are explained in its proposal review document. See id. at 649-61 (plaintiff's factors 4 and 5 evaluation); id. at 684-707

16

(intervenor-defendant's factors 4 and 5 evaluation). The agency also thoroughly documented its comparison of the two proposals. See id. at 710-20. Plaintiff's argument that the agency treated its proposal differently from intervenor-defendant's amounts to a disagreement with the way the agency compared the two. Such disagreement with an agency's assessment of proposals "fall[s] far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process." Banknote Corp., 56 Fed. Cl. at 384.

Finally, plaintiff's assertion that the agency failed to properly consider its proposal revisions is a clear disagreement with the agency's evaluation. The record reflects that the agency reviewed plaintiff's revised proposal. See, e.g., ECF No. 32-30 at 652, 655 (discussing plaintiff's revisions in three references). The court is unconvinced that the agency's evaluation of plaintiff's proposal was irrational or unconsidered. Without more, the court does not reexamine the minutiae of the agency's technical evaluation and does not substitute its judgment for that of the agency here. Bowman, 419 U.S. at 286.

The court finds that the agency's evaluation did not evince inconsistent application of the evaluation criteria or disparate treatment of plaintiff's proposal, and plaintiff's claim on this point must fail.

        D.       The Agency Reasonably Conducted the Best Value Tradeoff

Finally, plaintiff argues that the agency's technical ratings "necessarily yielded a prejudicial and unreasonable best value determination." ECF No. 58 at 59. According to plaintiff, the agency "justified its best value determination solely on [intervenor-defendant's] higher technical rating for the program management approach requirements of Factor 5.1." Id. Plaintiff argues that this rating was the product of an uneven and disparate evaluation and "relied upon the very OCIs that the Agency failed to mitigate." Id. Plaintiff goes on to argue that even if that rating were correct, it should have been outweighed by the higher rating plaintiff should have received for factor four—but for the agency's poor evaluation. See id. Absent these errors, plaintiff contends that it would have presented the best value to the government. See id. at 60.

Defendant responds that this argument is "rehashing" plaintiff's allegations concerning the agency's evaluation. ECF No. 50 at 57. Defendant contends that plaintiff failed to show that the evaluation was irrational or did not comply with the evaluation criteria, and failed to demonstrate prejudice. See id. at 57-58.

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (citations omitted). An agency properly exercises such discretion "so long as it documents its final award decision and includes the rationale for any business judgments and tradeoffs made." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009) (citation omitted). Here, plaintiff failed to

17

demonstrate that the court should overturn the agency's best value judgment. As discussed above, the evaluation errors asserted by plaintiff amounted to no more than disagreements with the agency's conclusions, and the court will not overturn them. The agency thoroughly documented its evaluation and best value decision. See ECF No. 32-30 at 605-723; id. at 710-20 (comparison of the two proposals); 721-22 (summarizing the Source Selection Advisory Council recommendation and trade-off analysis); id. at 724-27 (re-visit of the source selection decision). As such, the agency's best value tradeoff must stand, and plaintiff's claim on this point must fail.

IV.  Conclusion

Accordingly, for the foregoing reasons:

(1) Plaintiff's motion for judgment on the AR, ECF No. 42, is **DENIED**;

(2) Defendant's and intervenor-defendant's cross-motions for judgment on the AR, ECF No. 49, and ECF No. 50, are **GRANTED**;

(3) The clerk's office is directed to **ENTER** final judgment in defendant's and intervenor-defendant's favor **DISMISSING** plaintiff's complaint with prejudice; and

(4) On or before **February 28, 2022**, the parties are directed to **CONFER** and **FILE** a **notice** attaching the parties' agreed upon redacted version of this opinion, with all competition-sensitive information blacked out.

IT IS SO ORDERED.

s/Patricia E. Campbell-Smith<br>
PATRICIA E. CAMPBELL-SMITH<br>
Judge